**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**

---------------------------------------------------------------x

LUDLOW EXCHANGE, LLC d/b/a NOVIG,

Plaintiff,

- vs. -

ANDY WILSON, in his official capacity as Attorney General of Ohio; ANDROMEDA MORRISON, in her official capacity as Interim Executive Director of the Ohio Casino Control Commission; THOMAS J. STICKRATH, in his official capacity as Chair and Commissioner of the Ohio Casino Control Commission; PENELOPE CUNNINGHAM, in her official capacity as Vice Chair and Commissioner of the Ohio Casino Control Commission; SHEETAL BAJORIA, in her official capacity as Commissioner of the Ohio Casino Control Commission; SCOTT BORGEMENKE, in his official capacity as Commissioner of the Ohio Casino Control Commission; TRIFFON CALLOS, in his official capacity as Commissioner of the Ohio Casino Control Commission; KEITH CHENEY, in his official capacity as Commissioner of the Ohio Casino Control Commission; and CHRISTOPHER SMITHERMAN, in his official capacity as Commissioner of the Ohio Casino Control Commission,

Defendants.

---------------------------------------------------------------x

Civil Action No. ____________________

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

Plaintiff Ludlow Exchange, LLC d/b/a Novig ("Novig"), by and through its undersigned counsel, brings this Complaint for Declaratory and Injunctive Relief against Defendants Andy Wilson, Andromeda Morrison, Thomas J. Stickrath, Penelope Cunningham, Sheetal Bajoria, Scott Borgemenke, Triffon Callos, Keith Cheney, and Christopher Smitherman, each sued in his or her official capacity (collectively, "Defendants"), alleging as follows:

## INTRODUCTION

1. Novig brings this action to enjoin Defendants from enforcing Ohio's discriminatory and preempted sports gambling laws against federally regulated transactions that the Commerce Clause protects and that Congress placed within the exclusive jurisdiction of the Commodity Futures Trading Commission ("CFTC").

2. Novig, Inc. was founded in 2021 with the goal of providing sports-based event contracts to customers across the United States. Event contracts are derivative instruments that enable parties to trade on their predictions about whether a future event will occur. To pursue that goal under federal regulation, Novig, Inc. formed Plaintiff Ludlow Exchange, LLC d/b/a Novig as its wholly owned subsidiary on October 14, 2025, for the purpose of operating as a CFTC-regulated Designated Contract Market ("DCM"). Novig pursued and obtained the relevant federal designation in 2026. On June 16, 2026, the CFTC designated Novig as a DCM after conducting the thorough review prescribed by the Commodity Exchange Act (the "CEA" or the "Act"). As a DCM, Novig is subject to the CFTC's 23 "Core Principles," along with the broader CFTC regulatory framework. 7 U.S.C. § 7(d). On August 12, 2026, Novig amended its Rulebook, adding Chapter 14, which focuses on responsible trading standards.[1] Novig is based in New York but offers event contracts to customers located in Ohio.

3. The event contracts Novig lists are a type of derivative instrument that is extensively regulated under federal law and that can be listed, traded, and settled only on federally registered exchanges. In particular, event contracts are quintessential "swaps" as defined by the CEA and therefore can only be traded on federally regulated exchanges that are subject to the exclusive jurisdiction of the CFTC. Congress granted the CFTC "exclusive jurisdiction" over precisely such

---

[1] *See* Ludlow Exchange, LLC, Self-Certification of Rule Amendments Establishing Responsible Trading Standards (Aug. 12, 2026).

transactions. 7 U.S.C. § 2(a)(1)(A). Under the CFTC's supervision, event-contract markets have flourished. These still-growing markets have become a multi-billion-dollar industry as investors, market participants, and the public at large have found event contracts to be an enormously valuable tool for generating information about the likelihood of a future event taking place and hedging risks. Billions of dollars in transaction volume have already been traded on event-contract exchanges in the United States in 2026 alone.

4. On October 2, 2026, the Ohio Casino Control Commission (the "Commission"), through its Interim Executive Director, Andromeda Morrison, issued a cease-and-desist letter to Novig, asserting that by offering sports event contracts to persons located in Ohio without a sports gaming license, Novig is "operating online sports gaming" and is "clearly engaged in bookmaking or facilitating bookmaking in violation of Ohio civil and criminal law."[2] The letter requires Novig to notify the Commission in writing that it has ceased offering sports event contracts in Ohio, and warns that Novig's failure to comply "may result in the Commission pursuing all legal remedies and actions against Novig, including, but not limited to, administrative, civil, nuisance, or criminal actions." Novig brings this action to prevent Defendants from bringing this preempted enforcement action against Novig.[3]

5. Under Defendants' view, sports event contracts offered to persons located in Ohio constitute unlicensed "sports gaming" under Chapter 3775 of the Ohio Revised Code and "bookmaking" under Chapter 2915 of the Ohio Revised Code, and may not be offered without a

---

[2] Letter from Andromeda Morrison, Interim Exec. Dir., Ohio Casino Control Comm'n, to Novig Betting, Inc. and Ludlow Exchange, LLC (Oct. 2, 2026) ("October 2 Letter").

[3] The Commission sent cease-and-desist letters on the same day to other prediction-market operators, including Polymarket US and Underdog Predict. *See* Compl. ¶¶ 7, 83, *QCX LLC* v. *Wilson*, No. 2:26-cv-01502 (S.D. Ohio Oct. 16, 2026), Dkt. No. 1; Pls.' Mot. for Prelim. Inj. or, in the Alternative, for a Stay Pending Appeal at ii, *Underdog Exch. DCM*, *Inc.* v. *Wilson*, No. 1:26-cv-02169 (N.D. Ohio Oct. 16, 2026), Dkt. No. 13.

license issued by the Commission, irrespective of the CFTC's designation of the exchange or the CFTC's treatment of the contract.

6. The CEA forecloses application of Ohio law in this way. The statute's text, history, and context all show that Congress intended to vest the CFTC with centralized authority over regulated derivatives markets and to ensure nationwide uniformity in those markets. Congress gave the CFTC exclusive jurisdiction over "transactions involving swaps or contracts of sale of a commodity for future delivery . . . traded or executed on a contract market designated pursuant to section 7 of this title." 7 U.S.C. § 2(a)(1)(A). Sports event contracts comfortably fall within the statutory definition of a swap because they are "contract[s]" that "provide[] for any purchase, sale, payment, or delivery . . . dependent on the occurrence, nonoccurrence, or the extent of the occurrence of an event or contingency associated with a potential financial, economic, or commercial consequence." *Id.* § 1a(47)(A)(ii). Additionally, such contracts are "commonly known to the trade as a swap." *Id.* § 1a(47)(A)(iv). And as a binary option contract, a sports event contract is an agreement, contract, or transaction that is a "put, call, cap, floor, collar, or similar option of any kind" that is "based on the value[ ] of 1 or more . . . commodities . . . or other financial or economic interests or property of any kind." *Id.* § 1a(47)(A)(i).

7. Despite the CFTC's exclusive jurisdiction over event contracts, Ohio has threatened to pursue legal action against Novig. But Ohio's threatened enforcement of its laws is preempted. Pursuant to the CEA's mandate, the CFTC has constructed a comprehensive regulatory regime to oversee both event-contract trading and the entities that facilitate those transactions. Section 2 of the CEA grants the CFTC "exclusive jurisdiction" over all "transactions involving swaps" that are "traded or executed" on a DCM. 7 U.S.C. § 2(a)(1)(A). Because Novig's event contracts fall squarely within the Act's definition of "swap" and those swaps are traded on a DCM, they are subject to the CFTC's exclusive jurisdiction. *See id.* § 2(a)(1)(A). The CEA also impliedly preempts

Ohio's gambling laws as applied to Novig; the statutory grant of "exclusive jurisdiction" over swaps traded on a DCM evinces Congress's intent to oust states from this field and for the CFTC to be the sole regulator of these transactions. *Id.* § 2(a)(1)(A).

8. Congress's preemptive intent is expressed in the statutory text. When it created the CFTC in 1974, Congress deleted the provision of the Act that had, until then, preserved "any State law applicable" to futures trading, doing so, as its floor sponsor explained, "[i]n order to assure that Federal preemption is complete." 120 Cong. Rec. 30,464 (1974) (statement of Sen. Curtis). The conference report stated that the amendments would "preempt the field insofar as futures regulation is concerned" and that Congress did "not contemplate that there w[ould] be a need for any supplementary regulation by the States." H.R. Rep. No. 93-1383, at 35–36 (1974) (Conf. Rep.). Indeed, when the House proposed a provision that would allow state law to apply to CEA-regulated transactions, the Senate agreed to its inclusion only after amending the provision to clarify that it applied "[e]xcept as *hereinabove* provided" in the grant of exclusive jurisdiction to the CFTC. *See* 7 U.S.C. § 2(a)(1)(A) (emphasis added); S. Rep. No. 93-1131, at 31 (1974).

9. Ohio's demand also runs afoul of the U.S. Constitution in another way. Ohio's sports gaming regime discriminates against interstate commerce. Ohio makes it a felony to operate sports gaming without complying with Chapter 3775 of the Ohio Revised Code, Ohio Rev. Code § 3775.99(B)(9), but reserves its online sports gaming licenses for applicants with an in-state place of business or a contractual relationship with an Ohio-based proprietor, *id.* §§ 3775.04(A)(3), 3775.05(E)(2); requires that the servers accepting wagers be located in Ohio, *id.* § 3775.11(C); and permits licensees to accept wagers only from persons physically located in Ohio, *id.* § 3775.11(A). Novig is not based in Ohio and members that trade on its exchange are located in States other than Ohio. Those discriminatory requirements violate the Constitution's promise of open, interstate commerce.

10. Defendants' letter relies on the Sixth Circuit's decision in *KalshiEX LLC* v. *Schuler*, 2026 WL 2884087 (6th Cir. Sept. 25, 2026), asserting that it "makes clear that Ohio's sports gaming laws apply to Novig's sports event contracts." But *Schuler* is not final: a petition for rehearing en banc is pending before the Sixth Circuit, and three petitions for certiorari presenting the same preemption question are pending before the Supreme Court. And *Schuler* was decided against a different legal landscape. On October 9, 2026, the CFTC—exercising its express statutory authority to "further define" the term "swap"—issued an Interim Final Rule and a Notice of Proposed Rulemaking in direct response to decisions, including *Schuler*, that in the CFTC's view had "deviate[d] from the plain text of the 'swap' definition" and "impose[d] atextual limitations on the concept of an 'event.'" Further Definition of "Swap" to Exclude Casino-Style Gambling Products, 91 Fed. Reg. 65,969, 65,971 (Oct. 19, 2026) (to be codified at 17 C.F.R. pt. 1) (citing *Schuler*, 2026 WL 2884087, at *11). Those rules confirm that event contracts, including sports-related event contracts, are swaps within the CFTC's exclusive jurisdiction, and they undermine the premise on which *Schuler* rested. Moreover, *Schuler* itself recognized that the CEA's exclusive-jurisdiction provision "displaces direct enforcement and regulatory authority pertaining to the licensing and operation of" designated contract markets, *Schuler*, 2026 WL 2884087, at *21—precisely the authority the Commission seeks to exercise in demanding that Novig cease operating a DCM that offers sports event contracts to persons located in Ohio.

11. Novig thus seeks declaratory and injunctive relief under 42 U.S.C. § 1983, the Declaratory Judgment Act, and the Constitution. *See* 28 U.S.C. §§ 1651, 2201, 2202. Ohio's licensing regime violates the Commerce Clause, federal law preempts Ohio law as Defendants seek to apply it, and this Court has the equitable power to enjoin Defendants from enforcing unconstitutional and preempted state gambling laws. *See Ex parte Young*, 209 U.S. 123, 156–60 (1908). Given Ohio's stated view and threatened enforcement, Novig must either risk exposing the

company to significant civil and criminal liability or refrain from offering event contracts to Ohio residents altogether. "The dilemma posed by that coercion—putting the challenger to the choice between abandoning his rights or risking prosecution—is 'a dilemma that it was the very purpose of the Declaratory Judgment Act to ameliorate.'" *MedImmune, Inc.* v. *Genentech, Inc.*, 549 U.S. 118, 129 (2007) (citation omitted).

12. Absent this Court's relief, Novig will incur irreparable harm. If Novig continues to offer event contracts to its users in Ohio, Defendants may bring an enforcement action premised on the view that Novig is violating Ohio's sports gaming laws, potentially exposing Novig to felony liability under Ohio Rev. Code § 3775.99(B)(9) and Chapter 2915 of the Ohio Revised Code; civil penalties and fines under Ohio Rev. Code §§ 3775.02(H)(1)(a) and 3772.04 and Ohio Admin. Code 3775-1-08; and nuisance abatement remedies under Chapter 3767 of the Ohio Revised Code. Exposure of that magnitude is substantial, and Ohio's sovereign immunity would place it beyond recovery even after litigation exposes the fatal flaws in Defendants' legal position. These irreparable harms warrant equitable relief. Novig also easily clears the other bars for seeking a preliminary injunction. Both the balance of the equities and the public-interest considerations support this Court's intervention in Novig's favor.

## PARTIES

13. Plaintiff Novig is a limited liability company organized under the laws of the State of Delaware. Novig was formed on October 14, 2025, and is in good standing under Delaware law. Novig is headquartered in New York, New York, and its principal place of business is 169 Madison Avenue, Suite 2199, New York, NY 10016. Novig was organized for the purpose of operating as a DCM regulated by the CFTC, and it conducts no other business.

14. Novig filed its application for designation as a contract market with the CFTC on December 16, 2025. The CFTC has designated Novig as a DCM under Section 7 of the

Commodity Exchange Act, 7 U.S.C. § 7. The CFTC granted that designation on or about June 16, 2026, finding that Novig's application and demonstrations established its ability to comply with the Act and the CFTC's regulations applicable to DCMs. The CFTC approved the application subject to the conditions that Novig comply with all representations and submissions made in support of it, that Novig comply with all provisions of the Act and the CFTC's regulations applicable to designated contract markets, and that Novig permit no futures commission merchant to intermediate transactions or carry customer accounts unless the Order of Designation is amended. *See* In the Matter of the Application of Ludlow Exchange, LLC for Designation as a Contract Market, Order of Designation (CFTC June 16, 2026).

15. On August 12, 2026, Novig amended its Rulebook, adding Chapter 14, which outlines Novig's responsible trading commitments. Chapter 14 clearly articulates how Novig protects traders. Only participants at least 21 years of age may trade. Participants may set binding daily, weekly, or monthly limits on their own trading and deposits, and may freeze trading on their accounts for periods ranging from one day to one year. Novig enforces those elections through third-party identity screening, so that a participant cannot open a second account to evade a limit set by the participant, and Novig participates in an industry-wide program allowing participants to engage in an exclusion across multiple prediction-market platforms. Novig also screens for prohibited traders, identifying participants who attempt to transact in markets where they hold undue influence over the outcome or have access to material nonpublic information. Novig further invests significant resources in training its employees and increasing public awareness on the importance of maintaining responsible trading best practices.[4]

---

[4] *See* Self-Certification of Rule Amendments Establishing Responsible Trading Standards, *supra* note 1.

16. The event contracts at issue in this action are listed, traded, and settled on Novig's federally regulated DCM. Novig's trading model is non-intermediated: contracts trade on an anonymous electronic central limit order book, are cleared on a fully collateralized basis by a derivatives clearing organization, and no futures commission merchant may intermediate any transaction or carry any customer account.

17. Defendant Andy Wilson is the Attorney General of Ohio and is sued in his official capacity. The Attorney General has the power and duty to enforce Ohio's laws, including the laws at issue here. *See* Ohio Rev. Code § 109.02.

18. Defendant Andromeda Morrison is the Interim Executive Director of the Ohio Casino Control Commission and is sued in her official capacity. The Commission has "jurisdiction over all persons conducting or participating in the conduct of sports gaming" in the State of Ohio. Ohio Rev. Code § 3775.02(A). Interim Executive Director Morrison signed the October 2, 2026, cease-and-desist letter to Novig.

19. Defendant Thomas J. Stickrath is the Chair and a Commissioner of the Ohio Casino Control Commission and is sued in his official capacity. The Commission administers Ohio's sports gaming licensing regime under Chapter 3775 of the Ohio Revised Code, including the licensing and regulation of sports gaming proprietors and mobile management services providers.

20. Defendant Penelope Cunningham is the Vice Chair and a Commissioner of the Ohio Casino Control Commission and is sued in her official capacity.

21. Defendant Sheetal Bajoria is a Commissioner of the Ohio Casino Control Commission and is sued in her official capacity.

22. Defendant Scott Borgemenke is a Commissioner of the Ohio Casino Control Commission and is sued in his official capacity.

23. Defendant Triffon Callos is a Commissioner of the Ohio Casino Control Commission and is sued in his official capacity.

24. Defendant Keith Cheney is a Commissioner of the Ohio Casino Control Commission and is sued in his official capacity.

25. Defendant Christopher Smitherman is a Commissioner of the Ohio Casino Control Commission and is sued in his official capacity.

26. Together, Defendants are responsible for enforcing any demand that Novig comply with the Ohio sports gaming laws that are preempted as applied to event contracts traded on a federally designated contract market.

27. Defendants have threatened to exercise that enforcement authority against Novig if Novig does not cease and desist from offering, participating in offering, or facilitating those who offer sports event contracts in Ohio—including by "operating an FCM or DCM that offers sports event contracts to persons located in Ohio"—and notify the Commission in writing of its compliance.

## JURISDICTION AND VENUE

28. This Court has subject-matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343. This is an action for declaratory and injunctive relief brought under 42 U.S.C. § 1983 and the Court's equitable powers, *see Ex parte Young*, 209 U.S. 123 (1908), to enforce the Commerce Clause and the Supremacy Clause of the United States Constitution. The federal questions presented are (1) whether Ohio law—including Chapters 2915, 3767, and 3775 of the Ohio Revised Code—violates the Commerce Clause as applied to Novig by discriminating against interstate commerce; and (2) whether the Commodity Exchange Act, 7 U.S.C. § 1 *et seq.*, preempts Ohio's sports gaming and gambling laws insofar as they purport to regulate transactions on a CFTC-designated contract market.

29. The Court may award injunctive relief under 28 U.S.C. § 1651 and may award declaratory and other appropriate relief under 28 U.S.C. §§ 2201 and 2202.

30. The Eleventh Amendment does not bar this action. Novig sues only state officials, in their official capacities, and names no state agency as a defendant. "[A] state official . . . is not the State for sovereign-immunity purposes." *Va. Off. for Prot. & Advoc.* v. *Stewart*, 563 U.S. 247, 255 (2011). Under *Ex parte Young*, a plaintiff may sue Ohio officials in their official capacities for prospective declaratory and injunctive relief to stop the threatened enforcement of state law that violates federal law. *Ex parte Young*, 209 U.S. at 156; *Verizon Md., Inc.* v. *Pub. Serv. Comm'n of Md.*, 535 U.S. 635, 645–46 (2002). Novig seeks precisely that relief here.

31. This Court has personal jurisdiction over Defendants. Defendants are domiciled in Ohio and perform their official duties in Ohio.

32. Venue is proper in this District under 28 U.S.C. § 1391(b)(1) and (b)(2) because all Defendants reside in Ohio and a substantial part of the events giving rise to Novig's claim occurred in this District. Novig offers event contracts to Ohio residents located in the Northern District of Ohio, including residents located in Cleveland and Akron, Ohio, and Defendants' threatened enforcement action would be directed at transactions occurring in this District.

## FACTUAL ALLEGATIONS

### A. Event Contracts Are Derivative Instruments That Allow Market Participants to Hedge Risk and Generate Real-Time Information About Consequential Events.

33. This action concerns derivatives. A derivative takes its value from something else—an asset, a rate, or a variable known as the underlier. The CEA defines the "commodities" that may serve as underliers in sweeping terms so that they cover not only physical goods such as wheat, oil, and gold, but also intangibles such as financial indices, interest rates, and the occurrence or

nonoccurrence of an event carrying financial, commercial, or economic significance. *See* 7 U.S.C. § 1a(9), (19).

34. Among the most familiar derivatives is the swap—an arrangement under which two parties exchange payments measured by the value or performance of some underlying reference, whether an interest rate, a commodity price, or a real-world contingency. *See Sec. Indus. & Fin. Mkts. Ass'n* v. *CFTC*, 67 F. Supp. 3d 373, 385 (D.D.C. 2014). Event contracts represent a paradigmatic subspecies of swaps because they allow market participants to take positions on whether a future occurrence will materialize. Most are binary: every "yes" position is matched by a corresponding "no" position, and at expiration the party who read the outcome correctly is paid.

35. Take a contract on whether the Cleveland Browns will win the NFL Super Bowl. Once that question resolves (whether the Browns win the Super Bowl), the contract expires and settles accordingly. The side representing the occurrence (*i.e.*, "the Browns win") receives the contract payout, while the side representing the nonoccurrence (*i.e.*, "the Browns do not win") receives nothing. The event contract settles with one side receiving $1 and the other side $0; the specified contingency either occurs or does not occur.

36. These contracts can also, importantly, be traded in the market at any point before the event contract expires. Thus, the contract's price will fluctuate as market participants trade in and out of positions, reflecting the market's real-time views regarding the probability of the underlying future event based on, among other things, new data.

37. Take an example from the 2026 NBA Finals. In Game 4 of the 2026 NBA Finals, the Knicks entered as favorites on prediction markets. As the Spurs built a commanding lead in the game, the markets flipped, and by the start of the fourth quarter, with the Spurs up 95 to 75, the Spurs were priced at around a 99 percent probability of winning the game. Then the Knicks rallied. OG Anunoby tipped in a missed Jalen Brunson three-pointer with 1.2 seconds remaining to

complete a record 29-point comeback and a 107 to 106 win, and all the while the markets repriced accordingly. That real-time repricing is the mechanism by which event-contract trading aggregates dispersed information about the probability of the underlying outcome.[5]

38. Much like a company's stock price fluctuates based on the market's continual reassessment of the company's value—reflecting the public's perception of information related to the company's future earnings—event contracts likewise reflect the market's up-to-date prediction of the probability that a particular event will transpire.

39. Event contracts, like many financial instruments, serve multiple important financial functions. Event contracts can be a form of investment, and they can also serve as a device for mitigating risk for market participants who are already exposed in other ways to the consequences of the underlying event.[6] Sporting outcomes in particular carry economic weight for a wide range of participants. That is unsurprising given that sports are a multi-billion-dollar industry that ripples across the broader economy. Advertisers, sponsors, broadcasters, ticketing and hospitality businesses, municipalities, and state-licensed sportsbooks all have financial exposure that turns on how games end. Sports-related event contracts let those parties manage that exposure.

40. Several examples neatly illustrate this principle. A regional sponsor whose marketing spend is tied to a team's postseason run can offset the risk of an early exit by purchasing event contracts against the team's championship odds. A hotel whose occupancy depends on whether the local team hosts a home playoff game can protect against that exposure by taking a position against the team's seeding. A broadcaster whose ad revenue turns on ratings for a marquee matchup can hedge the risk that a star player is unavailable by purchasing contracts against that player's

---

[5] *Knicks Championship Odds Swing from 62 to 38 to 82 Percent in Game 4 Thriller*, RealGM (June 11, 2026), https://basketball.realgm.com/wiretap/286022/Knicks-Championship-Odds-Swing-From-62-To-38-To-82-Percent-In-Game-4-Thriller.

[6] Andrew Ross Sorkin et al., *Hedging, Not Betting, on Sports via Prediction Markets*, N.Y. Times: DealBook (Feb. 10, 2026), https://perma.cc/VP2T-NLP5.

participation. A state-licensed sportsbook, whose book concentrates exposure to a particular outcome by design, can offset that exposure on an exchange rather than absorbing it alone. Sports event contracts, in other words, allow market participants to isolate and efficiently price the risk of a single economically consequential occurrence. These are not hypothetical examples.[7]

41. Beyond hedging, these markets generate valuable information, often in real time. Market participants often research the underlying event's probability before taking a position; thus, their trades may provide valuable information to the public. The depth and breadth of participation also improve the quality of information. Liquidity is therefore critical to price discovery because it allows market participants to move in and out of their positions efficiently. The public benefits from the wisdom of the crowd if the event contract's market is liquid and includes the most well-informed traders.

42. Congress also recognized the twin roles that derivatives play in the national economy by declaring that derivative transactions "are affected with a national public interest by providing" both a means of hedging risk and a mechanism for "disseminating pricing information through trading in liquid, fair and financially secure trading facilities." 7 U.S.C. § 5(a).

**B. Congress Granted the CFTC Exclusive Jurisdiction Over Derivatives Traded on Federally Designated Exchanges, Including Swaps.**

43. Federal supervision of derivatives spans more than a century. Before 1922, these instruments commanded little judicial respect. One court dismissed futures trading as "gambling in grain," *Cothran* v. *Ellis*, 16 N.E. 646, 647 (Ill. 1888), and the Supreme Court described futures

---

[7] Brandon Marcello, *How a Prediction Market Insured $3M in LSU Title Bonuses in 72 Seconds*, CBS Sports (Sept. 1, 2026), https://perma.cc/DFY4-3TRJ; Rebecca Tauber, *Why Sports Bar Owners Are Hedging Against the Teams They Love*, The Athletic (Oct. 30, 2026) https://perma.cc/S2U2-VT6U; *NYC Local Bar The Jeffrey Uses Kalshi to Hedge Knicks Promotion*, Kalshi News (June 1, 2026), https://perma.cc/4BM6-2NCS; Michael J. de la Merced, *Prediction Markets' Next Major Bet: Wall St. Traders*, N.Y. Times: DealBook (June 17, 2026) https://perma.cc/GKW8-EW6Y.

contracts as "nothing more than a wager," *Irwin* v. *Williar*, 110 U.S. 499, 508–09 (1884). Numerous states passed laws to suppress or restrict futures trading of commodities.

44. That view did not hold. Over time, as markets matured and the economic value of derivatives became more apparent, courts and commentators came to recognize these instruments as a "means of avoiding or mitigating catastrophes, equalizing prices, and providing for periods of want." *Bd. of Trade of City of Chi.* v. *Christie Grain & Stock Co.*, 198 U.S. 236, 247 (1905). Congress followed suit by first centralizing futures trading on federally approved contract markets in the Grain Futures Act of 1922, ch. 369, 42 Stat. 998, 1000–02 ("Grain Futures Act"), and then broadening federal supervision of derivatives exchanges in the CEA 14 years later, Pub. L. No. 74-675, 49 Stat. 1491 (1936).

45. As first enacted, the CEA left "any State law applicable" to covered transactions undisturbed. *Id.* at 1494. That changed in 1974. Congress created the CFTC to administer the statute and vested it with "exclusive jurisdiction" over transactions in derivatives listed and traded on federally registered exchanges. 7 U.S.C. § 2(a)(1)(A).

46. Congress left no doubt about what it was doing. Alongside the grant of exclusive jurisdiction, it struck the clause that had preserved "any State law applicable" to futures trading. *See* H.R. Rep. No. 93-1383, at 35 (1974) (Conf. Rep.); 120 Cong. Rec. 30,464 (1974) (statement of Sen. Curtis) (proposing the deletion "[i]n order to assure that Federal preemption is complete"). When the House floated language that would have let state law reach CEA-regulated transactions, the Senate accepted only after amending the provision to clarify that it applied "[e]xcept as hereinabove provided"—that is, subject to the exclusive-jurisdiction grant. *See* 7 U.S.C. § 2(a)(1)(A); S. Rep. No. 93-1131, at 31 (1974). Preemption was a central goal of this legislation. As one commentator put it, "preemption was a central issue in the proceedings which culminated in the 1974 amendments to

the CEA." Kevin T. Van Wart, *Preemption and the Commodity Exchange Act*, 58 Chi.-Kent L. Rev. 657, 692 (1982) (emphasis omitted).

47. The concern driving that choice was practical. Congress recognized the obvious point that a national market cannot function under fifty regulators. As one Senator put it, regulation under "different State laws would just lead to total chaos." Commodity Futures Trading Commission Act Hearings on S. 2485, S. 2578, S. 2837, and H.R. 13113*, Before the S. Comm. on Agric. & Forestry*, 93d Cong. 685 (1974) (statement of Sen. Clark). The House Committee on Agriculture sought to place "all exchanges and all persons in the industry under the same set of rules and regulations for the protection of all concerned." H.R. Rep. No. 93-975, at 79 (1974). The conference report was explicit that the amendments would "*preempt the field* insofar as futures regulation is concerned," and that Congress did "not contemplate that there w[ould] be a need for any supplementary regulation by the States." H.R. Rep. No. 93-1383, at 35–36 (1974) (Conf. Rep.) (emphasis added).

48. Congress simultaneously widened the statutory definition of "commodity" to encompass "all other goods and articles . . . and all services, rights, and interests . . . in which contracts for future delivery are presently or in the future dealt in." 7 U.S.C. § 1a(9). The purpose was to capture "futures trading that might now exist or might develop in the future." H.R. Rep. No. 93-975, at 79 (1974).

49. In 2010, Congress further broadened the CFTC's exclusive jurisdiction to cover swaps. The CFTC's exclusive jurisdiction now reaches "transactions involving swaps or contracts of sale of a commodity for future delivery . . . traded or executed on a contract market designated pursuant to section 7 of this title." 7 U.S.C. § 2(a)(1)(A). The amendment placed swaps "on the same exclusive jurisdictional footing as exchange-traded commodity futures," and supplied an "explicit congressional mandate to carry out regulation of the swap markets under federal law free

from potential state interference." Barry Taylor-Brill, *Cracking the Preemption Code: The New Model for OTC Derivatives*, 13 Va. L. & Bus. Rev. 1, 3, 13 (2019).

50. This statutory history extends in one direction. Congress has legislated three times in this area, and each time, it has decided to enlarge the federal role such that it has become "abundantly clear that all futures trading must be brought under a single regulatory umbrella." H.R. Rep. No. 93-975, at 44–45 (1974).

51. The definition of "swap" is correspondingly broad, covering any "agreement, contract, or transaction" that "provides for any purchase, sale, payment, or delivery . . . dependent on the occurrence, nonoccurrence, or the extent of the occurrence of an event or contingency associated with a potential financial, economic, or commercial consequence." 7 U.S.C. § 1a(47)(A)(ii). Courts ruling on the legal question at issue have taken that language at face value, observing that "[t]he CEA's definition of 'swap' is broad, a description that flows from the relevant terms Congress used in § 1a(47)(A)(ii)." *United States* v. *Minnesota*, 2026 WL 2150211, at *12 (D. Minn. July 27, 2026) (citing *United States* v. *Phillips*, 155 F.4th 102, 113 (2d Cir. 2025)); *see Coinbase Fin. Mkts.* v. *Raoul*, 2026 WL 2969682, at *7 (N.D. Ill. Oct. 2, 2026) (observing that the "swap" definition "reads about as broadly as it could"). The definition also encompasses any agreement, contract, or transaction that is a "put, call, cap, floor, collar, or similar option of any kind" that is "based on the value[ ] of 1 or more . . . commodities . . . or other financial or economic interests or property of any kind." 7 U.S.C. § 1a(47)(A)(i). After all, Congress wrote the definition to capture instruments that "in the future become[] commonly known to the trade as a swap." *Id.* § 1a(47)(A)(iv).

52. In its Notice of Proposed Rulemaking, the CFTC—pursuant to its expressly delegated authority under the CEA—proposes to define a "swap" to include "[e]vent contracts, including those based on sports-, politics-, cultural-, and weather-related events." Further Definition of "Swap"—Inclusions, 91 Fed. Reg. 66,022, 66,025 (proposed Oct. 19, 2026) (to be codified at 17

C.F.R. pt. 1). The CFTC issued this proposed rule due to "widespread confusion" to "expressly clarify that event contracts, including those based on sports . . . are swaps." *Id.*

53. The CFTC provided three statutory justifications for defining sports event contracts as "swaps." First, such contracts are "commonly known to the trade as a swap" under 7 U.S.C. § 1a(47)(A)(iv), which is consistent with the CFTC's decades-long position that event contracts are derivatives subject to its jurisdiction, whether as "swaps" or as "binary options" (which are themselves swaps). *Id.* at 66,025–26.

54. Second, sports event contracts are based on an occurrence or contingency "associated with a potential financial, economic, or commercial consequence" pursuant to 7 U.S.C. § 1a(47)(A)(ii). As part of its justification, the CFTC discussed the potential economic consequences associated with sports events, such as: increased ticketing revenue and franchise valuation that can accompany postseason success; enhanced viewership during a close game; player contractual bonuses tied to statistical results; and promotions that link the outcome of a sporting event to a financial consequence for a business (*e.g.*, a furniture store in Houston that runs a promotion in which customers who spend a minimum amount receive refunds if the Houston Astros win the World Series). *Id.* at 66,029.

55. And third, a plain reading of 7 U.S.C. § 1a(47)(A)(i) indicates that a sports event contract is a "put, call, cap, floor, collar, or similar option of any kind" that is "based on the value [ ] of 1 or more . . . commodities . . . or other financial or economic interests or property of any kind." Sports event contracts are structured as binary options, because they are "structured as binary options, meaning that the contract's payout is a predetermined fixed amount (typically, one dollar) if the underlying condition is satisfied, and zero if it is not." *Id.* at 66,027.

56. Two narrow carveouts accompany the grant of exclusive jurisdiction, and neither is implicated here. One preserves the authority of the Securities and Exchange Commission and other

federal agencies over instruments within their statutory mandate. *See* 7 U.S.C. § 2(a)(1). The other leaves the states room to apply generally applicable laws to off-exchange transactions—those not conducted on a DCM—and to unregistered entities. *Id.* § 16(e)(1); *see* H.R. Rep. No. 97-565, pt. 1, at 43 (1982) (States may regulate "transactions outside those preserved exclusively for the jurisdiction of the CFTC").

57. Novig is registered as a DCM, and its contracts trade on an exchange. It is a contract market designated by the CFTC, and the transactions at issue occur on that market. The off-exchange carveout therefore has no application, and no other federal agency claims these instruments.

### C. The CFTC Comprehensively Regulates Designated Contract Markets and the Event Contracts They List.

58. Derivatives may be offered to the public only on a CFTC-approved DCM. 7 U.S.C. §§ 2(e), 7(a); 17 C.F.R. § 38.3(a).

59. Such approval does not come easily. An applicant must document its compliance with the 23 Core Principles set forth in the CEA. 7 U.S.C. §§ 2(e), 7(a), 7(d); 17 C.F.R. § 38.3(a)(2). An applicant must also show that it will observe the CFTC's rules; that it will adopt, monitor, and enforce its own rules; that the contracts it lists are not readily susceptible to manipulation; that it has both the capability and the obligation to detect and prevent manipulation, price distortion, and disruption through surveillance, compliance, and enforcement; and that it will impose position limits to constrain manipulation risk. 17 C.F.R. §§ 38.100, 38.150, 38.200, 38.250, 38.300.

60. The obligations do not end at designation. A DCM must assume "a duty of self-regulation, subject to the Commission's oversight," and also is required to "enact and enforce rules to ensure fair and orderly trading." *Am. Agric. Movement, Inc.* v. *Bd. of Trade of City of Chi.*, 977 F.2d 1147, 1150–51 (7th Cir. 1992). A slew of other CFTC regulations govern in painstaking detail various other parts of the entity's operations, from recordkeeping and daily market-data reporting to

the public disclosure of certain contract terms and rules and other requirements relating to liquidity, dispute resolution, governance, and auditing. To give one illustrative example, a DCM must extend "impartial access to its markets and services" to every person holding trading privileges. 17 C.F.R. § 38.151(b). An entity may lose its designation if it is found in noncompliance with these regulations.

61. A DCM has two routes to listing a new contract. It may certify in writing, no later than the business day preceding listing, that the contract conforms to the CEA and the CFTC's rules, 7 U.S.C. § 7a-2(c)(1); 17 C.F.R. § 40.2(a); or it may seek the CFTC's approval beforehand, 7 U.S.C. § 7a-2(c)(4)(A); 17 C.F.R. §§ 40.3(a), 40.11(c). Under the latter route, the CFTC must "approve a new contract . . . unless the Commission finds that the new contract . . . would violate" the CEA or its regulations. 7 U.S.C. § 7a-2(c)(5)(B).

62. An entity cannot avoid oversight through certification. The CFTC has a 10-day window to "stay[] the certification" for additional review. 7 U.S.C. § 7a-2(c)(3). If the Commission does not act within this period, the new contract is deemed approved. *Id.* § 7a-2(c)(2).

63. Congress also legislated specifically with respect to event contracts. Under the special rule adopted in the Dodd-Frank Wall Street Reform and Consumer Protection Act, Pub. L. No. 111-203, 124 Stat. 1376 (2010) ("Dodd-Frank"), the CFTC may find an event contract "contrary to the public interest" where it "involves" activity unlawful under federal or state law, terrorism, assassination, war, gaming, or comparable activity the CFTC identifies by rule. 7 U.S.C. § 7a-2(c)(5)(C)(i) (the "Special Rule"). The CFTC has long taken the position that the Special Rule operates as a "discretionary review framework rather than a self-executing per se prohibition" and that the Special Rule "does not authorize the CFTC to impose a per se prohibition" on the listing of such event contracts independent of a public interest determination. Prediction Markets; Public

Interest Determinations, 91 Fed. Reg. 35,806, 35,811, 35,813, 35,815 (proposed June 12, 2026); *see* 17 C.F.R. § 40.11(a)(1)–(2).

64. Two consequences follow from Congress's decision to give the Commission such authority. The first is that event contracts touching on gaming—which include sports-based event contracts—are within the Commission's exclusive jurisdiction. A grant of power to review them presupposes as much. The second is that Congress opted for a regime of individualized, contract-by-contract analysis rather than the use of categorical, blanket prohibitions.

65. The CFTC is drafting an amendment to the Special Rule regarding whether sports-related event contracts are "consistent with the public interest." *See* Prediction Markets; Public Interest Determinations, 91 Fed. Reg. at 35,836. The CFTC expects this amended Special Rule to become final by the end of November. *See* Resp. to Mot. for Summ. Disposition at 2, *U.S. Commodity Futures Trading Comm'n* v. *Johnson*, No. 26-4281 (9th Cir. filed Sept. 24, 2026), Dkt. No. 29.1 (noting that the CFTC expected the revised version of the Special Rule to become final within the next two months).

66. The CFTC is also equipped with the full panoply of tools necessary to conduct this analysis and ensure regulatory compliance across the industry. The CFTC has the authority to bring actions in federal court or before administrative tribunals, and it is empowered to seek a range of remedies, including civil monetary penalties, restitution, disgorgement, injunctive relief, cease-and-desist orders, and suspension, denial, revocation, or restriction of registration and trading privileges. The CFTC may also refer matters to the Department of Justice or state authorities if it finds evidence of criminal conduct. CFTC, Div. of Enf't, Enforcement Manual § 3.3 (2020).

67. In sum, federal law reaches every stage of an event-contract transaction. The CFTC prescribes the procedures by which a contract may be listed and retains authority to review, stay, and prohibit it; designates and supervises the exchange that lists it; and polices the trading that follows.

### D. Novig Sought to Operate under State Licensing Regimes, Found Them Structurally Incompatible with an Exchange, and Obtained Federal Designation.

68. Novig, Inc.'s founders were familiar with prediction markets from the company's earliest days and came to view that model as the better fit for Novig's product. Novig, Inc. did not initially pursue federal designation because, in the regulatory environment then prevailing, it anticipated that federal approval could take years and offered no assurance that sports-related event contracts would be permitted. Novig, Inc. therefore first pursued state-by-state licensing, securing a Colorado license in October 2023, before withdrawing from that market in April 2024 and later pursuing a federally regulated prediction-market model.

69. Novig, Inc. was founded in 2021 by Jacob Fortinsky and Kelechi Ukah and was incorporated in Delaware on March 3, 2021.

70. Novig, Inc.'s founders conceived the company after observing that established sportsbooks routinely limited or banned customers who won too often, treating a successful bettor, in the words of its chief executive, "the same way a casino treats a card counter." The company sought to eliminate that practice. Its exchange structure removes what the company describes as "unfair odds and punitive limits on winning traders," and produces prices driven by real-time supply and demand rather than by bookmaker discretion.

71. Indeed, the Novig name is an homage to the key distinctions between event-contract platforms and sportsbooks. Traditional sportsbooks make money by adjusting the odds so that they include a commission for the sportsbook to cover the costs of facilitating the wager. This commission is called "vigorish" or "vig" in the language of sportsbooks. The Novig name reflects a business model in which the company does not charge a "vig."[8]

---

[8] *See* Novig, "Exchange vs Sportsbook," https://novig.com/blog/exchange-vs-sportsbook (last visited Nov. 3, 2026).

72. Novig, Inc. did not begin by seeking federal designation. It first attempted to operate within precisely the state licensing framework that Defendants now seek to enforce against Novig. On September 21, 2023, the State of Colorado Department of Revenue, Division of Gaming approved an Internet Sports Betting Operator license for Novig Laboratories, LLC d/b/a Novig, and the company launched its product in that State in October 2023.

73. Colorado's regulations recognized exchange wagering as a form of sports wagering, defining "exchange wagers" as "a form of wagering in which two or more persons place identically opposing wagers in a given market, allowing patrons to wager on both winning and non-winning outcomes in the same event." 1 Colo. Code Regs. § 207-2:1.4(8) (2023). Yet in 2023 Colorado declined to adopt proposed rules for exchange wagering. Novig, Inc. sought their adoption through the process the State provided. It participated in at least two stakeholder meetings, and on December 13, 2023, formally requested that Colorado "prioritize the passage of exchange wagering regulations," stating that it was "fully prepared to comply with any additional regulations or guidelines" the State might set. The company thereafter proposed a modified feature and met with the Division of Gaming to explain this feature. On February 9, 2024, the Division determined that the proposed feature would constitute exchange wagering and advised the company to "wait until appropriate proposed rules are not only voted on by [Colorado] but, if applicable, go into effect."

74. That effort demonstrated why a state-by-state licensing model is structurally incompatible with an event-contract exchange. The traditional framework was designed for sportsbooks—operators that act as counterparties to every wager, set their own prices, and earn revenue from the spread between those prices and true probability. An exchange earns no vig and takes no position. It depends instead on liquidity: a trade can occur only if a buyer and a seller can be matched at the same price. Confining an exchange's participants within a single state's borders deprives it of the counterparties that make the market function at all. Novig, Inc. encountered

further difficulty with other state regulators. Regulators are often incentivized to protect incumbent operators over a lower-margin product like Novig's that would reduce state tax revenue. A licensing regime calibrated to the economics of the house does not readily accommodate a market with no house.

75. In April 2024, Novig, Inc. withdrew from the Colorado market. It thereafter remitted unpaid patron funds to the Colorado Treasury and, in March 2025, submitted its request to surrender the license and withdraw its associated persons, which the Division of Gaming confirmed it would process.

76. Novig, Inc. formed Plaintiff Ludlow Exchange, LLC d/b/a Novig, or "Novig," on October 14, 2025, to pursue a federally regulated prediction market model. Novig applied to the CFTC for designation as a contract market pursuant to Section 5(a) of the CEA, 7 U.S.C. § 7(a), and Commission regulation 38.3(a), 17 C.F.R. § 38.3(a). Novig's application comprised submissions dated January 1, 2026, through June 10, 2026, and included Novig's Certificate of Formation, its Amended and Restated Operating Agreement, its Certificate of Good Standing, its Rulebook, and a narrative demonstrating Novig's compliance with each of the Core Principles applicable to designated contract markets.

77. On June 16, 2026, the CFTC granted that designation, placing Novig within the same regulatory architecture that governs futures and derivatives exchanges generally. CFTC staff reviewed Novig's application, including its rules and the representations Novig made, and conducted a technical evaluation of Novig's operational capabilities to evaluate its compliance with the Core Principles and corresponding CFTC regulations applicable to DCMs under Section 5(d) of the Act, 7 U.S.C. § 7(d), and CFTC regulations 17 C.F.R. §§ 38.100–38.1201. The CFTC found that Novig's application and demonstrations established its ability to comply with the Act and the CFTC's

regulations applicable to DCMs, and provided sufficient assurance that Novig would continue to comply.

78. Novig is therefore not an intermediary that routes customer orders to an exchange operated by another entity. Novig is itself the federally regulated exchange. Every contract at issue in this action is listed, traded, and settled on a contract market designated by the CFTC under Section 7 of the CEA. Novig is responsible for ensuring compliant surveillance, using systems and tools that monitor exchange activity in real time and on a trade-date-plus-one basis, and for enforcing its trading rules. Novig is likewise responsible for compliant regulatory reporting and recordkeeping, investigations, disciplinary actions, and establishing rules to resolve disputes involving its market participants.

79. Consistent with the seriousness with which Novig takes its obligations, on August 12, 2026, Novig submitted to the CFTC a rule certification adding a new chapter to its Rulebook on "Responsible Trading Standards."[9] The new rules establish binding standards governing, among other things, participant education, marketing, platform design, participant controls, incentive programs, contract review, monitoring and intervention, and age and eligibility requirements. Among other protections, the rules require risk disclosures before trading, tools allowing participants to set limits and cooling-off periods, restrictions on promotional practices that could encourage loss-chasing, monitoring for potentially concerning trading activity, and a minimum trading age of twenty-one.

80. Novig's designation reflects a federal judgment about how these instruments are to be regulated. The CFTC does not regulate casinos or sportsbooks; it regulates markets. In designating Novig, the CFTC found that Novig complied with the statutory and regulatory

---

[9] *See* Self-Certification of Rule Amendments Establishing Responsible Trading Standards, *supra* note 1.

requirements governing federally designated derivatives markets—the same determination that subjects Novig to comprehensive federal oversight, and the same determination that Defendants' threatened enforcement would nullify.

81. Novig's regulatory history is thus the opposite of evasion. Novig, Inc. sought a state license, obtained one, and complied with it. It relinquished that license only after concluding that the state framework could not accommodate an exchange model, and it thereafter obtained federal designation through the process Congress established for exactly this category of instrument. Defendants now seek to apply to Novig the very state licensing regime that the company tested, found structurally unworkable for an exchange, and lawfully exited.

### E. Ohio Has Threatened to Enforce Its Discriminatory Sports Gaming Laws Against Novig.

82. Whereas the CFTC regulates nationwide derivatives markets, Ohio's Sports Gaming Act legalized sports wagering in Ohio under a regime designed to favor local businesses and prevent interstate competition. Sports gaming cannot be offered in Ohio without a license issued by the Commission. Ohio Rev. Code § 3775.03(A). A person offers sports gaming when it accepts wagers on sporting events, *id.* § 3775.01(O)(1), and to "wager" is "to risk a sum of money or thing of value on an uncertain occurrence," *id.* § 3775.01(DD).

83. Ohio issues its mandatory online sports gaming licenses—type A sports gaming proprietor licenses—only to applicants that maintain "at least one operational place of business in this state" or operate a sports gaming facility in Ohio. Ohio Rev. Code § 3775.04(A)(3). It directs the Commission to give preference to professional sports organizations, casino operators, and video lottery sales agents, taking into account factors such as the nature of the applicant's physical presence in Ohio, the length of time the applicant has been doing business in Ohio, the taxable income it pays to its employees in Ohio, and its economic involvement in the State. *Id.* § 3775.041(A), (C); Ohio Admin. Code 3775-4-02(C). The Commission may license no more than

twenty-five such proprietors absent a showing that "the sports gaming market in this state needs" more, Ohio Rev. Code § 3775.04(A)(2), and every other operator may offer online wagering only as a "mobile management services provider" acting on behalf of a type A proprietor, *id.* §§ 3775.01(G)(1), 3775.05(E)(1)–(2). None of the national online operators that serve Ohioans holds a type A license in its own right; each operates only under contract with an Ohio proprietor. Ohio further requires that "[t]he server responsible for accepting wagers through an online sports pool shall be located in a secure facility in this state," *id.* § 3775.11(C), and permits a licensee to accept wagers only from individuals "who are physically located in this state," *id.* § 3775.11(A).

84. Ohio imposes criminal liability for offering sports gaming without a license. It is a felony to operate sports gaming in Ohio in a manner that does not comply with Chapter 3775 of the Ohio Revised Code. Ohio Rev. Code § 3775.99(B)(9). Unlicensed sports gaming is punishable by fines of up to $7,500 for a first offense and $10,000 thereafter. *See id.*; *id.* §§ 2929.14(A)(4)–(5), 2929.31(A)(6)–(7). The Commission further takes the position that conducting or participating in unlicensed sports gaming constitutes "bookmaking"—"the business of receiving or paying off bets"—or facilitating bookmaking in violation of Chapter 2915 of the Ohio Revised Code. *Id.* § 2915.01(A); *see id.* § 2915.02. Ohio law defines a "bet" as "the hazarding of anything of value upon the result of an event, undertaking, or contingency, but does not include a bona fide business risk." *Id.* § 2915.01(B). Gambling is a misdemeanor, and a felony for repeat offenders. *Id.* § 2915.02(K).

85. The Commission also claims the power to impose civil penalties. In its letter to Novig, the Commission asserted the power to impose "a civil penalty or fine, including for an amount equal to the money or value of the property that Novig has unlawfully obtained or retained by offering these event contracts on sporting events to persons located in Ohio." *See* Ohio Rev. Code §§ 3775.02(H)(1)(a), 3772.04(B); Ohio Admin. Code 3775-1-08. Those administrative

penalties are uncapped. The Commission further asserted that it "may also pursue additional civil and administrative remedies against Novig, its officers, directors, and holding or parent companies."

86. In addition to criminal and civil penalties, the Commission asserts that Novig's online content, including its website, "constitutes a nuisance under Ohio law that is subject to abatement under R.C. Chapter 3767."

87. On October 2, 2026, the Commission issued a cease-and-desist letter to Novig. The letter asserts that, "by offering 'event contracts' on sporting events to persons located in the State of Ohio, without a sports gaming license," Novig is "violating Ohio law," and that, "[p]lainly stated, Novig is operating online sports gaming." Citing *Schuler*, the letter asserts that the Sixth Circuit's decision "makes clear that Ohio's sports gaming laws apply to Novig's sports event contracts." The letter "demands that Novig cease and desist from offering, participating in offering, or facilitating those who offer sports event contracts in Ohio," including "soliciting or accepting orders for sports event contracts listed on DCMs from persons located in Ohio, as well as operating an FCM or DCM that offers sports event contracts to persons located in Ohio," and directs Novig to "notify the Commission in writing no later than fourteen (14) days following the date of th[e] letter that it has complied." The letter warns that Novig's "failure to abide by this notice may result in the Commission pursuing all legal remedies and actions against Novig, including, but not limited to, administrative, civil, nuisance, or criminal actions pursuant to R.C. Chapters 2915, 3767, and 3775, and any rules adopted thereunder."

88. The threat is not theoretical. The Commission sent cease-and-desist letters the same day to other prediction-market operators, including Polymarket US and Underdog Predict. It sent similar letters to three other prediction-market operators on March 31, 2025, and on April 14, 2026, it sought a $5 million penalty against KalshiEX LLC in an administrative proceeding. *See* Notice of

Intent to Impose a Penalty at 4, *In re KalshiEX LLC*, No. 2026-SGR-001 (Ohio Casino Control Comm'n Apr. 14, 2026).

89. On October 20, 2026, the Commission directed its own licensees to immediately cease "facilitating, supporting, or providing services of any kind to an entity offering sports event contracts to persons located in Ohio without a sports gaming license" and to notify the Commission of their compliance by October 30, 2026. Letter from Andromeda Morrison, Interim Dir., Ohio Casino Control Comm'n, to Sports Gaming Licensees (Oct. 20, 2026) ("Morrison Letter").

90. Any subsequent enforcement action against Novig would likely seek injunctive relief, civil penalties, and nuisance abatement, and because unlicensed sports gaming is a felony under Ohio Rev. Code § 3775.99(B)(9), it may also seek criminal penalties. Other states have likewise sought civil monetary penalties amounting to billions of dollars and criminal sanction against other DCMs.[10]

91. Compliance with Defendants' demands is not a practical alternative for Novig. Ohio's framework is designed for licensed sportsbook operators with an in-state presence and is structurally incompatible with an event-contract exchange. Novig does not maintain a place of business in Ohio and could obtain a license, if at all, only by contracting with an Ohio-based proprietor, Ohio Rev. Code §§ 3775.04(A)(3), 3775.05(E)(2)—an arrangement the Commission has warned its licensees against. Licensure would also require Novig to locate its trade-accepting servers in Ohio, *id.* § 3775.11(C), confine its Ohio market to persons physically present in Ohio, *id.*

---

[10] On October 28, 2026, Utah's Attorney General filed 13 felony charges against Kalshi and its co-founders and one misdemeanor charge. *See State of Utah* v. *KalshiEX,* LLC, AGO No. 9465862. Similarly, Arizona's Attorney General filed a 20-count misdemeanor information against KalshiEX LLC and Kalshi Trading LLC. *See* Information, *State* v. *KalshiEX LLC*, Nos. CR2026-000173-001 & CR2026-000173-002 (Ariz. Super. Ct. Maricopa Cnty. Mar. 16, 2026). Other states, such as New York have pursued civil monetary penalties against Kalshi and Polymarket. *See* Notice of Removal, *New York* v. *KalshiEX LLC*, No. 1:26-cv-06550 (S.D.N.Y. July 31, 2026), Dkt. No. 1; Notice of Removal, *New York* v. *QCX LLC*, No. 1:26-cv-08338 (S.D.N.Y. Sept. 24, 2026), Dkt. No. 1.

§ 3775.11(A), and pay Ohio sports gaming taxes, *id.* § 5753.021. Those requirements would fragment the national liquidity that a CFTC-designated exchange requires, because an event contract can be executed only if a buyer and a seller can be matched at the same price. If Novig were required to make comparable exclusions in every other state that seeks to apply its gambling laws in this manner, each such state would impose comparable geographic limitations. Such geographic partitioning would deprive Novig's markets of the liquidity on which they depend and frustrate the public interest Congress sought to advance in creating a federally regulated national market. Prediction markets aggregate dispersed information most accurately when they are broad, liquid, and open to participants across the country; the wider the pool of informed participants, the more reliably prices track the probability of the underlying event. Carving the market into fifty walled-off state exchanges would thin liquidity, degrade price discovery, and undermine the very informational value Congress recognized in declaring derivatives transactions "affected with a national public interest by providing" a means "for . . . disseminating pricing information through trading in liquid, fair and financially secure trading facilities." 7 U.S.C. § 5(a). Limiting the geographic scope of customers limits the efficacy of the market in ways Congress did not intend.

92. Novig therefore confronts a stark choice: *abandon* the Ohio market, attempt to submit to a licensing regime that is incompatible with its exchange model and, as a practical matter, unavailable to it, or proceed and face the enforcement action the Commission has threatened. Novig has no option but to seek judicial relief.

## CLAIMS FOR RELIEF

### COUNT I
### United States Constitution
### (Commerce Clause—Discrimination Against Interstate Commerce)
### U.S. Const. art. I, § 8, cl. 3; 42 U.S.C. § 1983

93. Novig repeats and incorporates by reference each of the allegations set forth above.

94. Defendants' threatened enforcement of Ohio's state gaming licensing regime violates the U.S. Constitution's Commerce Clause by discriminating against out-of-state commerce.

95. The Commerce Clause's grant of authority to Congress "implicitly includ[es] a negative component forbidding certain state regulations," at the "very core" of which "is an antidiscrimination principle." *Energy Mich., Inc.* v. *Mich. Pub. Serv. Comm'n*, 126 F.4th 476, 486 (6th Cir. 2025).

96. Laws that discriminate against interstate commerce—"facially, purposefully, or in practical effect," *id.* at 487—"face a virtually per se rule of invalidity." *Granholm* v. *Heald*, 544 U.S. 460, 476 (2005) (internal quotation marks omitted).

97. Defendants insist that Novig is "operating online sports gaming" and may not offer its event contracts to persons located in Ohio "without a sports gaming license." October 2 Letter at 1. But Ohio's sports gaming regime discriminates against out-of-state entities. Under Ohio law, the same conduct is criminal "bookmaking" when conducted without a license and lawful when conducted by a licensee, Ohio Rev. Code § 2915.02(A)(1), (C). The only variable is the license, and the license requires an applicant to be located in Ohio.

98. Ohio's licensing restrictions provide that online sports gaming licenses are available only to proprietors that maintain "at least one operational place of business in this state" or operate a sports gaming facility in Ohio—with statutory preference for Ohio's casinos, racinos, and professional sports organizations—or to operators acting on those in-state businesses' behalf. Ohio Rev. Code §§ 3775.01(G)(1), (Z), 3775.04(A)(3), 3775.041(A), (C), 3775.05(E)(2). Physical presence in the State is thus the distinguishing factor. As a result, in-state businesses receive benefits that out-of-state businesses do not share, rendering the licensing regime facially discriminatory. *See Novartis Pharms. Corp.* v. *Griffin*, 833 F. Supp. 3d 956, 989–90 (E.D. Ark. 2026); *Energy Mich.*, 126 F.4th at 487–88 (laws whose benefits or burdens are "territorially based" discriminate on their face). Indeed,

Ohio law even expressly contemplates "exchange wagering," Ohio Rev. Code § 3775.01(O)(2), but its licensing scheme effectively excludes an exchange, like Novig's, that is operated from outside the State.

99. The licensing regime also discriminates against out-of-state businesses in practical effect. Requiring out-of-state businesses to partner with an in-state business imposes costs that in-state competitors need not bear. *See Granholm*, 544 U.S. at 474–75; *McNeilus Truck & Mfg., Inc.* v. *Ohio ex rel. Montgomery*, 226 F.3d 429, 442–43 (6th Cir. 2000) (Ohio licensing scheme that allowed out-of-state manufacturers to sell in Ohio only through agreements with in-state franchised dealers discriminated against interstate commerce in purpose and effect).

100. The only route Ohio offers an out-of-state operator depends on an Ohio proprietor's willingness to contract with it. Ohio Rev. Code § 3775.05(A), (E)(2). But the Commission has warned its licensees that a decision to "associate, coordinate, or otherwise partner directly or indirectly with entities offering or facilitating the offering of sporting event contracts in Ohio" will bear on their "continued suitability" to hold a license, and that the Commission "may take administrative action against any licensee that does." Letter from Matthew T. Schuler, Exec. Dir., Ohio Casino Control Comm'n, to Sports Gaming Licensees (Aug. 25, 2025). The Commission recently ordered licensees to cease facilitating, supporting, or providing services of any kind to prediction markets operating without a sports gaming license. Morrison Letter at 2. In effect, Ohio has announced that a national contract market like Novig cannot comply with Ohio's scheme short of becoming an Ohio-based company.

101. Ohio's discriminatory licensing provisions are not "narrowly tailored" to advance a legitimate, nonprotectionist local purpose. *Tenn. Wine & Spirits Retailers Ass'n* v. *Thomas*, 588 U.S. 504, 518, 539 (2019). Ohio law separately subjects sports gaming proprietors to suitability, financial, integrity, and responsible-gaming requirements. Ohio Rev. Code §§ 3775.02(B)(6)–(8), (10)–(11),

(D), (F)(2), (I)(1), 3775.04(D)(3), 3775.10(A)(9), (B); Ohio Admin. Code 3775-16-10, 3775-16-17. And the Commission may accept "another jurisdiction's license" as evidence of a mobile management services provider's fitness. Ohio Rev. Code § 3775.05(B)(2). It is mere speculation to suppose that maintaining a place of business in Ohio, or partnering with an Ohio casino or sports team, is necessary—much less narrowly tailored—to advance any legitimate, nonprotectionist purpose. *See Tenn. Wine*, 588 U.S. at 518, 539.. This is particularly true in light of the CFTC's regulatory regime, which requires DCMs to demonstrate that the contracts it lists are not readily susceptible to manipulation; that they are capable of detecting and preventing manipulation, price distortion, and disruption through surveillance, compliance, and enforcement; and that they will impose position limits to constrain manipulation risk. 17 C.F.R. §§ 38.100, 38.150, 38.200, 38.250, 38.300.

102. Ohio law imposes yet another physical-presence requirement. The obligation that "[t]he server responsible for accepting wagers through an online sports pool shall be located in a secure facility in this state," Ohio Rev. Code § 3775.11(C); *see* Ohio Admin. Code 3775-9-02(C), would compel an out-of-state business like Novig, which operates a single nationwide market from centralized infrastructure, to build and operate a duplicate Ohio installation as the price of serving Ohio residents. That is precisely the kind of restriction the Supreme Court has long "viewed with particular suspicion"—a rule "requiring business operations to be performed in the home State that could more efficiently be performed elsewhere." *Granholm*, 544 U.S. at 475.

103. That restriction is not necessary. The Commission's own rules provide that the in-state server requirement "does not prohibit sports gaming data from being stored or accessed elsewhere, including cloud-based environments." Ohio Admin. Code 3775-9-02(C). They also require every proprietor to give the Commission "read-only remote access to its sports gaming systems" wherever those systems sit, *id.* 3775-16-01(D), and guarantee the Commission "access to

real-time geofence data," *id.* 3775-9-03(C). Ohio even permits its sports gaming proprietors to manage risk "through the use of a liquidity pool in another jurisdiction." Ohio Rev. Code § 3775.10(D).

104. Ohio's regime also erects a barrier to interstate commerce through its geofencing provisions. A licensee may accept wagers only from individuals "who are physically located in this state" and must "use location based technology to prohibit individuals who are not physically present in this state from participating." Ohio Rev. Code § 3775.11(A); *see* Ohio Admin. Code 3775-17-01(A), (D). According to the U.S. Supreme Court, a law like Ohio's that overtly blocks the flow of interstate commerce at a State's borders is "[t]he clearest example" of unlawful protectionism. *City of Philadelphia* v. *New Jersey*, 437 U.S. 617, 624 (1978). By barring transactions that cross state lines, Ohio excludes out-of-state market participants from transactions that would otherwise occur in interstate commerce.

105. These discriminatory requirements fall with particular force on Novig. As alleged above, an exchange depends on liquidity drawn from a national pool of counterparties. Confining Novig's Ohio participants to trading only with other persons physically present in Ohio, through servers located in Ohio, and under the license of an Ohio-based proprietor would deprive Novig's market of the counterparties that make it function, while imposing no comparable burden on the in-state businesses Ohio's regime favors.

106. Ohio's sports gaming and gambling laws, including Chapters 2915, 3767, and 3775 of the Ohio Revised Code, therefore violate the Commerce Clause as applied to Novig. Novig is entitled under 42 U.S.C. § 1983 and *Ex parte Young* to declaratory and injunctive relief barring Defendants from enforcing those laws against it.

**COUNT II**
**United States Constitution**
**(Supremacy Clause—Preemption by the Commodity Exchange Act)**
**U.S. Const. art. VI, cl. 2; 42 U.S.C. § 1983**

107. Novig repeats and incorporates by reference each of the allegations set forth above.

108. The Supremacy Clause provides that "This Constitution, and the Laws of the United States which shall be made in Pursuance thereof . . . shall be the supreme Law of the Land; . . . any Thing in the Constitution or Laws of any State to the Contrary notwithstanding." U.S. CONST. art. VI, cl. 2. Federal law accordingly "is supreme in case of a conflict with state law." *Murphy* v. *NCAA*, 584 U.S. 453, 477 (2018).

109. "[S]tate laws that 'interfere with, or are contrary to the laws of congress . . .' are invalid." *Wis. Pub. Intervenor* v. *Mortier*, 501 U.S. 597, 604 (1991) (quoting *Gibbons* v. *Ogden*, 22 U.S. (9 Wheat.) 1, 211 (1824)). A preempted state law is "without effect." *Maryland* v. *Louisiana*, 451 U.S. 725, 746 (1981); *see Perez* v. *Campbell*, 402 U.S. 637, 652 (1971).

110. Federal law may preempt state law expressly or by implication. *See Geier* v. *Am. Honda Motor Co.*, 529 U.S. 861, 869 (2000). The Sixth Circuit recognizes three categories of preemption: express, field, and conflict preemption. Courts "will give preemptive effect to federal law where (1) a federal statute expressly preempts state law, (2) a federal law impliedly preempts state law, or (3) federal law and state law actually conflict." *Gibson* v. *Am. Bankers Ins. Co.*, 289 F.3d 943, 948–49 (6th Cir. 2002).

111. The "ultimate touchstone" of the inquiry is congressional intent. *Cipollone* v. *Liggett Grp., Inc.*, 505 U.S. 504, 516 (1992) (quoting *Malone* v. *White Motor Corp.*, 435 U.S. 497, 504 (1978)).

112. Under any and all of these frameworks, the Ohio laws Defendants have invoked—or may invoke—are preempted to the extent Defendants seek to enforce them against Novig for listing, trading, and settling event contracts on a federally designated contract market. Those laws include Chapter 3775 of the Ohio Revised Code, including Ohio Rev. Code §§ 3775.02, 3775.03(A),

3775.04, 3775.05, 3775.11, and 3775.99(B)(9); Ohio Rev. Code § 3772.04(B); Chapter 2915 of the Ohio Revised Code, including Ohio Rev. Code § 2915.02; Chapter 3767 of the Ohio Revised Code; Ohio Admin. Code 3775-1-08 and any other implementing Commission regulations; and any other Ohio law that purports to regulate Novig's listing, trading, or settlement of event contracts on a designated contract market.

113. The CEA grants the CFTC "exclusive jurisdiction . . . with respect to accounts, agreements . . . and transactions involving swaps or contracts of sale of a commodity for future delivery . . . traded or executed on a contract market designated pursuant to section 7 of this title." 7 U.S.C. § 2(a)(1)(A).

114. The statutory definition of "swap" is broad. A "swap" includes any "agreement, contract, or transaction" that "provides for any purchase, sale, payment, or delivery . . . that is dependent on the occurrence, nonoccurrence, or the extent of the occurrence of an event or contingency associated with a potential financial, economic, or commercial consequence." 7 U.S.C. § 1a(47)(A)(ii). Congress delegated to the CFTC and the Securities and Exchange Commission the authority to "further define" the term, 15 U.S.C. § 8302(d)(1).

115. The event contracts Novig lists satisfy each element of that definition. Each contract is an agreement providing for payment. Each payment depends on the occurrence, nonoccurrence, or extent of the occurrence of a defined event—the final score, margin, win-loss result, tournament advancement, or statistical performance in a professional or collegiate sporting event. And each such event is associated with potential financial, economic, or commercial consequences.

116. The events underlying Novig's contracts sit at the core of the definition. Professional and collegiate sporting outcomes bear on advertisers, sponsors, broadcasters, ticketing and hospitality businesses, municipalities, and the institutional investors who hold equity in

franchises and media rights. They bear as well on state-licensed sportsbooks, whose exposure to those outcomes is concentrated by design and who could use exchange-traded contracts to hedge.

117. The CFTC has reached the same conclusion. Pursuant to the authority provided by Congress, the CFTC published a Notice of Proposed Rulemaking that would define "swap" to include "[e]vent contracts, including those based on sports-, politics-, cultural-, and weather-related events." Further Definition of "Swap"—Inclusions, 91 Fed. Reg. at 66,022. The CFTC issued this proposed rule due to "widespread confusion" to "expressly clarify that event contracts, including those based on sports . . . are swaps." *Id.* at 66,025. As part of its justification, the CFTC highlighted the potential economic consequences associated with sports events. *Id.* at 66,029.

118. In addition to arguing that sports-related event contracts fall within the second prong of the CEA's definition of "swap," 7 U.S.C. § 1a(47)(A)(ii), the CFTC took the position that sports-related event contracts also fall within the first and fourth prongs, because they are a "put, call, cap, floor, collar, or similar option of any kind" that is "based on the value[ ] of 1 or more . . . commodities . . . or other financial or economic interests or property of any kind" and are "commonly known to the trade as a swap," *id.* § 1a(47)(A)(i), (iv). *See* Further Definition of "Swap"—Inclusions, 91 Fed. Reg. at 66,025–27.

119. Swap status does not turn on the subject matter of the underlying event. Congress carved out precisely two underliers from the CEA's reach—onions and motion picture box office receipts. 7 U.S.C. § 1a(9). Sporting events are not among them, and the enumeration of two forecloses invention of a third. *See NLRB* v. *SW Gen., Inc.*, 580 U.S. 288, 302 (2017) (the express inclusion of one item implies the exclusion of another left unmentioned).

120. Because the event contracts at issue are swaps traded on a contract market designated under Section 7, they fall within the CFTC's exclusive jurisdiction. 7 U.S.C. § 2(a)(1)(A).

121. Congress supplied the preemptive language itself. A grant of "exclusive" jurisdiction excludes others by its terms. The Supreme Court has confirmed that the "plain meaning" of a grant of "exclusive" jurisdiction "necessarily denies jurisdiction" to any other body. *Mississippi* v. *Louisiana*, 506 U.S. 73, 77–78 (1992). Where "Congress has made its [preemptive] intent known through explicit statutory language," *English* v. *Gen. Elec. Co.*, 496 U.S. 72, 79 (1990), courts give effect to the statute's "plain meaning," *Cipollone*, 505 U.S. at 521 n.19. Usage at the time of enactment was no different: "exclusive" meant "[s]hutting out; debarring from interference or participation; vested in one [entity] alone," and "exclusive jurisdiction" meant "power . . . over a[n entity] to the exclusion of all other[s]." *Exclusive*; *Exclusive Jurisdiction*, Black's Law Dictionary (5th ed. 1979).

122. Courts construing § 2(a)(1)(A) have long held that the Act preempts state law regulating futures trading on a federally regulated exchange. The Sixth Circuit has recognized that "the thrust of the [exclusive-jurisdiction] provision was to ensure that regulatory bodies other than the CFTC would not interfere," and that "regulation of commodity futures trading is essentially a matter of federal concern." *Curran* v. *Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 622 F.2d 216, 232, 235 (6th Cir. 1980), *aff'd*, 456 U.S. 353 (1982); *see Kelly* v. *Carr*, 691 F.2d 800, 804 n.12 (6th Cir. 1980) ("Congress intended to avoid a diversity of regulations between the C.F.T.C. and the states."). Other courts of appeals agree. *See Am. Agric. Movement, Inc.*, 977 F.2d at 1156–57; *Leist* v. *Simplot*, 638 F.2d 283, 322 (2d Cir. 1980) (Friendly, J.) ("§ 2(a)(1) of the CEA preempts the application of state law."), *aff'd sub nom. Merrill Lynch, Pierce, Fenner & Smith, Inc.* v. *Curran*, 456 U.S. 353 (1982); *FTC* v. *Ken Roberts Co.*, 276 F.3d 583, 591–92 (D.C. Cir. 2001). The principle has been applied to state gambling law specifically. In *Paine, Webber, Jackson & Curtis, Inc.* v. *Conaway*, the court held the CEA preempted a state gambling statute that would have voided futures contracts, observing that "there unquestionably is a federal interest in whether a state brands commodity transactions as 'gambling'

and effectively bars those transactions on federally regulated exchanges." 515 F. Supp. 202, 206 (N.D. Ala. 1981).

123. That principle has now been applied to these precise instruments. *See KalshiEX LLC* v. *Flaherty*, 172 F.4th 220, 229 (3d Cir. 2026) ("Here, the Act grants the CFTC exclusive jurisdiction over 'swaps . . . traded or executed on a [DCM],' which include Kalshi's sports-related event contracts." (quoting 7 U.S.C. § 2(a)(1)(A))); *KalshiEX, LLC* v. *Assad*, 2026 WL 2543846, at *7 (9th Cir. Aug. 28, 2026) ("We conclude that, based on its plain wording, § 2 preempts state regulation of swaps that are 'traded or executed' on a DCM."); *Minnesota*, 2026 WL 2150211, at *1 ("Plaintiffs have shown that the CEA's grant of exclusive jurisdiction over transactions involving swaps likely preempts across-the-board enforcement of the Minnesota prediction market statute against Kalshi and Polymarket US for a considerable swath of the event-contract trades they host."); *Raoul*, 2026 WL 2969682, at *18 ("Congress has given the CFTC exclusive jurisdiction to regulate many of Kalshi's sports-related swap contracts. That choice preempts the control defendants seek to exert over Kalshi."); *but see KalshiEX LLC* v. *Schuler*, 2026 WL 2884087, at *18 (6th Cir. Sept. 25, 2026) (holding that Kalshi's sports-event contracts are not swaps, but even if they were, the CEA does not preempt Ohio's or Tennessee's gambling laws).

124. *Schuler* does not alter that conclusion for at least three reasons.

125. *First*, *Schuler* is not final. Kalshi's petition for rehearing en banc is pending before the Sixth Circuit, *see KalshiEX LLC* v. *Schuler*, No. 26-3196 (6th Cir. Oct. 9, 2026), ECF No. 92, and three petitions for certiorari presenting the same question are pending before the Supreme Court, *see Flaherty* v. *KalshiEX, LLC*, No. 26-299 (U.S. Sept. 2, 2026); *Robinhood Derivatives, LLC* v. *Dreitzer*, No. 26-338 (U.S. Sept. 10, 2026); *N. Am. Derivatives Exch., Inc.* v. *Nevada*, No. 26-344 (U.S. Sept. 11, 2026). Ohio itself has urged the Supreme Court to grant review, describing the question as "an issue of immense importance" over which "[f]ederal and state courts are hopelessly confused and

divided." Br. of Amici Curiae Ohio et al. in Supp. of Pet'rs at 1, *Flaherty* v. *KalshiEX, LLC*, No. 26-299 (U.S. Oct. 7, 2026).

126. *Second*, the CFTC's subsequent rulemaking undermines *Schuler*'s continued authority. *Schuler* held that sports-event contracts are not swaps. Two weeks later, the CFTC—exercising the express authority Congress delegated to it to "further define" the term "swap," 15 U.S.C. § 8302(d)(1)—issued an Interim Final Rule and a Notice of Proposed Rulemaking in direct response to decisions, including *Schuler*, that in the agency's view had "deviate[d] from the plain text of the 'swap' definition" and "impose[d] atextual limitations on the concept of an 'event.'" Further Definition of "Swap" to Exclude Casino-Style Gambling Products, 91 Fed. Reg. at 65,971. The proposed rule would confirm by regulation that event contracts, including sports-related event contracts, are swaps, providing an "independent legal basis" for that conclusion and "facilitat[ing] uniform nationwide treatment of event contracts under the exclusive jurisdiction of the Commission." Further Definition of "Swap"—Inclusions, 91 Fed. Reg. at 66,025; 66,031. *Schuler* did not consider that agency action, which removes the premise on which its swap holding rested.

127. *Third*, even on its own terms, *Schuler* recognized that the CEA's exclusive-jurisdiction provision "displaces direct enforcement and regulatory authority pertaining to the licensing and operation of" designated contract markets. 2026 WL 2884087, at *21. The Commission's letter seeks to exercise precisely that authority, demanding that Novig cease "operating an FCM or DCM that offers sports event contracts to persons located in Ohio." October 2 Letter at 2. Novig preserves for further review its position that *Schuler* was wrongly decided.

128. Congress's own history confirms Novig's position. Congress amended the Act in 1974, creating the CFTC to oversee trading on DCMs due to concerns about "a patchwork of state regulations." *Flaherty*, 172 F.4th at 226. "The 1974 amendments also expanded the Act's reach from just agricultural products to all 'goods and articles . . . and all services, rights, and interests . . . in

which contracts for future delivery are presently or in the future dealt in.'" *Id.* (quoting 7 U.S.C. § 1a(9)).

129. The presumption against preemption does not apply here. The federal government has regulated derivatives markets continuously since 1922, *see generally Bd. of Trade of City of Chi.* v. *Olsen*, 262 U.S. 1 (1923) (assessing the constitutionality of the Grain Futures Act), and the presumption is not triggered in an area of longstanding federal presence, *see United States* v. *Locke*, 529 U.S. 89, 108 (2000). In any event, express preemptive language overcomes the presumption, and Congress supplied such language when it conferred "exclusive jurisdiction" on the CFTC. 7 U.S.C. § 2(a)(1)(A); *see Puerto Rico* v. *Franklin Cal. Tax-Free Tr.*, 579 U.S. 115, 125 (2016) ("[B]ecause the statute contains an express pre-emption clause, we do not invoke any presumption against pre-emption but instead focus on the plain wording of the clause, which necessarily contains the best evidence of Congress' pre-emptive intent.").

130. Novig does not contend that the Act preempts Ohio's regulation of gambling generally. Ohio remains free to license and police sportsbooks, casinos, and every other form of gambling conducted outside a federally designated contract market. Preemption reaches only trading on a market Congress placed within the CFTC's exclusive jurisdiction. *See Curran*, 622 F.2d at 232 ("Congress … vested exclusive jurisdiction over commodities futures trading with the CFTC.").

131. The CFTC agrees. On October 9, 2026, the CFTC published an Interim Final Rule that codified its longstanding position that casino-style gambling products, including wagers placed on sportsbooks and casino games, are excluded from the "swap" definition and thus the CFTC's exclusive jurisdiction. Further Definition of "Swap" to Exclude Casino-Style Gambling Products, 91 Fed. Reg. at 65,969. The CFTC adopted this rule to address "the erroneous premise that if event

contracts are swaps, then casino-style gambling products must also be swaps," an interpretation that is contrary to the swap definition's "plain text." *Id.* at 65,971.

132. Neither savings clause in § 2(a)(1)(A) disturbs the exclusive-jurisdiction grant. The first is subordinated in its own text: "[e]xcept as hereinabove provided," nothing in the section supersedes or limits the jurisdiction of other federal or state regulatory authorities. 7 U.S.C. § 2(a)(1)(A). What "hereinabove" precedes is the grant of exclusive jurisdiction, and that grant controls. The second savings clause preserves the jurisdiction of courts, not of state gaming regulators. The "prefatory clause indicates that swaps fall under the CFTC's exclusive jurisdiction," and that the "second carveout preserves jurisdiction for state courts in common-law actions but does not contravene the grant of CFTC's exclusive jurisdiction." *Flaherty*, 172 F.4th at 230–31; *accord Minnesota*, 2026 WL 2150211, at *11. And the preservation of state common-law actions carries no implication that Congress left room for state regulatory authority over on-exchange trading; the courts of appeals have long held the opposite. *See Curran*, 622 F.2d at 235 ("[R]egulation *of* commodity futures trading is essentially a matter of federal concern."); *Kotz* v. *Bache Halsey Stuart, Inc.*, 685 F.2d 1204, 1207 (9th Cir. 1982) ("Congress clearly intended to create a single agency to regulate the field [of futures trading]."). The carveouts and the exclusive grant operate together, and both point to preemption.

133. The Act's other provisions confirm rather than defeat preemption. Section 16(e)(1) preserves state authority over transactions "not conducted on or subject to the rules of a registered entity." 7 U.S.C. § 16(e)(1)(B)(i). However, "registered entities include DCMs, so that limiting principle does not apply." *Flaherty*, 172 F.4th at 229. Congress addressed state enforcement directly as well. Section 13a-2(1) authorizes state officials to sue over conduct violating the Act or the CFTC's rules, but withholds that authority as to federally registered entities. 7 U.S.C. § 13a-2(1). Congress thus calibrated the role of state officials with respect to this industry rather than leaving it

at large, and the role it assigned them does not extend to the exchanges the CFTC designates. The Sixth Circuit has explained that the 1978 amendment adding § 13a-2 "resolved the ambiguity with respect to the states' role in the Commodity Futures industry." *Kelly*, 691 F.2d at 803 n.8. *Schuler* did not address § 13a-2(1)'s exclusion of contract markets from state enforcement authority or *Kelly*'s discussion of § 13a-2.

134. Novig is not an unregistered entity operating off-exchange. It is designated by the CFTC, supervised by the CFTC, and subject to suspension or revocation of its designation by the CFTC. *See* 7 U.S.C. § 8(b).

135. Field preemption applies where Congress enacts a "scheme of federal regulation . . . so pervasive . . . that [it] left no room for the States to supplement it," or where a "federal interest is so dominant that the federal system will be assumed to preclude enforcement of state laws on the same subject." *Rice* v. *Santa Fe Elevator Corp.*, 331 U.S. 218, 230 (1947).

136. The analysis begins by identifying the field. *See Kansas* v. *Garcia*, 589 U.S. 191, 208 (2020). Courts must take care not to define it "too broadly." *Sikkelee* v. *Precision Airmotive Corp.*, 822 F.3d 680, 689 (3d Cir. 2016).

137. The field here is not gambling. It is the regulation of trading on federally designated contract markets—the discrete activity over which Congress conferred exclusive jurisdiction. The Court of Appeals for the Third Circuit so held: "[T]he District Court properly defined the scope of field preemption as the regulation of trading on a DCM (a form of futures trading) rather than as gambling (a broader and traditionally state-regulated field)." *Flaherty*, 172 F.4th at 229. The preempted field is accordingly "transactions involving 'swaps' over which the CFTC has exclusive jurisdiction." *Minnesota*, 2026 WL 2150211, at *14.

138. Congress has occupied that field completely. The Act and the CFTC's regulations govern who may operate a designated contract market, the standards for obtaining and retaining

designation, the contracts that may be listed and the procedures for listing them, the conduct of trading, the exchange's surveillance and enforcement duties, its recordkeeping and reporting obligations, its governance, its treatment of participants, and the consequences of noncompliance. *See* 7 U.S.C. §§ 2(e), 6(a)(1), 7, 7a-2, 8(b); 17 C.F.R. pt. 38; 17 C.F.R. pt. 40.

139. Conflict preemption applies where compliance with both state and federal law is impossible, or where state law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Hines* v. *Davidowitz*, 312 U.S. 52, 67 (1941).

140. Ohio's regime is structurally bounded by design. Ohio makes licensure available only to applicants with an Ohio place of business or a contract with an Ohio-based proprietor, and permits licensees to accept wagers only from persons physically located in Ohio. Ohio Rev. Code §§ 3775.04(A)(3), 3775.05(E)(2), 3775.11(A). On Defendants' theory, an exchange offering sports-related event contracts to Ohio residents must therefore exclude Ohio residents unless it submits to a state licensing regime incompatible with its exchange model. The practical effect is a geographic exclusion from Novig's federally regulated market.

141. Federal law imposes the opposite obligation. A designated contract market must "provide its members . . . with impartial access to its markets and services," including "[a]ccess criteria that are impartial, transparent, and applied in a non-discriminatory manner." 17 C.F.R. § 38.151(b), (b)(1).

142. Beyond the regulatory conflict lies a structural one. An event contract executes only when a buyer and a seller are matched at the same price. An exchange confined to the residents of a single state, and required to replicate that confinement in every other state, does not operate a thinner market; in many contracts it operates no market at all. The obstacle is not the expense of compliance, but rather the destruction of the exchange.

143. State enforcement of the kind Defendants threaten would frustrate Congress's objectives. Congress created the CFTC and conferred exclusive jurisdiction on it to eliminate the patchwork of state regulation and bring futures trading under a uniform national framework. State enforcement of gambling laws against a federally designated contract market "is exactly the patchwork that Congress replaced wholecloth by creating the CFTC." *Flaherty*, 172 F.4th at 230. Permitting each state to decide for itself which contracts a federally designated exchange may list would make the most restrictive state's standard the effective national rule—an outcome the CEA was enacted to prevent, and one Ohio's licensing and geographic restrictions make concrete.

144. State law is preempted when it would frustrate Congress's intent to bring the markets under a uniform set of regulations, and when its application would directly affect trading on or the operation of a futures market. *See Bibbo* v. *Dean Witter Reynolds, Inc.*, 151 F.3d 559, 563 (6th Cir. 1998); *Am. Agric. Movement, Inc.*, 977 F.2d at 1156. Applied to a designated contract market, that standard is satisfied. *Minnesota*, 2026 WL 2150211, at *14 ("[I]t appears likely that the Minnesota law will regulate transactions over which the CFTC has 'exclusive jurisdiction.' Accordingly, the Court finds that Plaintiffs are likely to succeed on the merits of their express-preemption claims."); *see Raoul*, 2026 WL 2969682, at *18 (finding that Kalshi, Coinbase, and the CFTC "are likely to succeed in demonstrating that several" of Illinois' gambling laws are preempted). Ohio's laws, as Defendants would apply them, would require Novig either to obtain a state license and operate within Ohio-specific restrictions or to exclude Ohio participants, thereby dictating who may transact on Novig's exchange.

145. Defendants' position rests on the premise that these contracts involve gaming and therefore belong to the states. Congress has already foreclosed that premise in Dodd-Frank.

146. In Dodd-Frank, Congress enacted a Special Rule for event contracts. The CFTC "may determine" that an event contract is "contrary to the public interest" where it "involve[s]"

activity unlawful under federal or state law, terrorism, assassination, war, gaming, or comparable activity the CFTC identifies by rule. 7 U.S.C. § 7a-2(c)(5)(C)(i). Where the CFTC so determines, the contract may not be listed. Otherwise, it may.

147. That provision presupposes that event contracts involving gaming are within the CFTC's jurisdiction. If such contracts escaped federal authority the moment they touched gaming, the Special Rule would have nothing to operate on, and courts do not read statutory provisions into irrelevance. *See Pulsifer* v. *United States*, 601 U.S. 124, 143 (2024) ("[T]hat kind of superfluity, in and of itself, refutes [petitioner's] reading."). Congress assigned the gaming question to the CFTC, not to the states.

148. Two instruments—an exchange-traded event contract and a wager—may reference the same game, but they are different in kind, and economic resemblance does not determine regulatory classification. The CFTC agrees. When implementing the Dodd-Frank amendments, the CFTC declined to bring traditional insurance products within the swap definition even though those products replicate the economics of instruments that are regulated as swaps, explaining that they had not been "historically treated" or "regulated" as swaps and were "subject to different regulatory regimes" under state law. Further Definition of "Swap," "Security-Based Swap," and "Security-Based Swap Agreement"; Mixed Swaps; Security-Based Swap Agreement Recordkeeping, 77 Fed. Reg. 48,208, 48,211–12 (Aug. 13, 2012). The CFTC's exclusive authority over exchange-traded event contracts leaves untouched the States' longstanding role in regulating wagers accepted by a house. The CFTC has drawn the same distinction between the two market structures, observing that the structure of a prediction market "is inapposite to that of legalized sports gambling, where the gaming company typically controls and adjusts the gambling odds." Prediction Markets; Public Interest Determinations, 91 Fed. Reg. at 35,807 n.6.

149. Novig's exchange functions as a venue. Its revenue does not generally depend on whether any participant's position resolves favorably. Price formation occurs among participants transacting across a national market—the same process that sets a listed security's price on a public exchange. Like other designated contract markets, Novig administers a market-maker function that supplies baseline depth and liquidity so that participants can enter and exit positions efficiently. That function is a standard feature of exchange design rather than a departure from it.

150. The sportsbook model inverts these features. The operator dictates the terms on which it will accept a wager and takes the other side of every one. *See United States* v. *McCoy*, 539 F.2d 1050, 1059 (5th Cir. 1976). Its posted odds express its own exposure and revenue objectives inside a licensed territory rather than the result of competitive bidding. Its economic interest is therefore opposed to its customers' interests because it earns the "vig" priced into those odds. *See United States* v. *Greco*, 619 F.2d 635, 637 (7th Cir. 1980) ("This amount of profit to the bookmaker is commonly referred to as 'vigorish,' 'vig' or 'juice.'").

151. Prices on Novig's exchange are generally set by participants, whose orders match by price and time priority through a non-discriminatory algorithm. Novig's revenue does not depend on whether any participant's position resolves favorably. The practice that gave rise to the distinction between an exchange and a sportsbook—restricting or excluding customers because they win too often—is the practice Novig was founded to eliminate. Novig applies position and payout limits, as every exchange does, to manage settlement risk and preserve orderly markets; it does not apply them to penalize participants for trading successfully. Novig also makes each participant's historical trading performance available directly in its platform, rather than requiring the request-and-review process a customer must navigate to obtain that information from a sportsbook. A venue that takes no position against its participants has no reason to obscure how they are performing.

152. Congress recognized that hedging on an exchange depends on the presence of willing counterparties, not on a house. *See Curran*, 456 U.S. at 358 ("The liquidity of a futures contract, upon which hedging depends, is directly related to the amount of speculation that takes place.").

153. A party seeking a preliminary injunction must show a likelihood of success on the merits, a likelihood of irreparable harm absent relief, that the balance of equities favors relief, and that an injunction serves the public interest. *In re DeLorean Motor Co.,* 755 F.2d 1223, 1228–29 (6th Cir. 1985); *see also Winter* v. *Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). Where the threat of irreparable harm is significant, the movant need only show a "sufficiently serious question to justify further investigation." *DeLorean*, 755 F.2d at 1230. Novig satisfies that standard.

154. Novig will suffer irreparable harm absent relief. "[C]omplying with a regulation later held invalid almost always produces [] irreparable harm." *Kentucky* v. *Biden*, 57 F.4th 545, 556 (6th Cir. 2023) (citation omitted). A regulated party is irreparably injured when it must choose between abandoning lawful activity and incurring ruinous civil and criminal liability under a preempted state law. *See Ex parte Young*, 209 U.S. at 148. The Court of Appeals for the Sixth Circuit so held on closely analogous facts in *Churchill Downs Tech. Initiatives Co.* v. *Mich. Gaming Control Bd.*, 162 F.4th 631, 635 (6th Cir. 2025), finding irreparable injury where a State sought to enforce its wagering law against an out-of-state wagering platform in conflict with a federal statute. Novig stands in the same position.

155. That is the choice Novig faces. If it offers event contracts to Ohio customers, it risks the enforcement action threatened by the Commission in the October 2, 2026, cease-and-desist letter. Such enforcement action may include felony prosecution pursuant to Ohio Rev. Code § 3775.99(B)(9) and Chapter 2915 of the Ohio Revised Code, civil penalties and fines pursuant to Ohio Rev. Code §§ 3775.02(H)(1)(a) and 3772.04(B) and Ohio Admin. Code 3775-1-08, and

abatement of a nuisance pursuant to Chapter 3767 of the Ohio Revised Code. If Novig withholds the product from Ohio, it forfeits access to Ohio participants entirely, sacrifices the liquidity a national exchange requires, and loses customers and goodwill.

156. Courts confronting the same dilemma have found it irreparable. If Defendants pursue enforcement action against Novig, the DCM "will either continue to offer [its] event contracts to [Ohio] users and face potential felony charges, or [it] will need to take steps to exit the market" for its trades in Ohio. *Minnesota*, 2026 WL 2150211, at *16.

157. Loss of goodwill and reputation is irreparable in this Circuit. *See Basicomputer Corp.* v. *Scott*, 973 F.2d 507, 512 (6th Cir. 1992). Other courts have found the same harms sufficient in these very cases. *See Minnesota*, 2026 WL 2150211, at *17 ("Such reputational harm and damage to the goodwill that Kalshi and Polymarket US have fostered with users of their platforms adds to the irreparable injury described above.").

158. Sovereign immunity forecloses any later remedy. Because Novig could not recover damages from Defendants even if it ultimately prevailed, the losses it would sustain in the interim are by definition irreparable. *See Minnesota*, 2026 WL 2150211, at *16.

159. Novig need not incur liability before seeking relief. *See Free Enter. Fund* v. *Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 490–91 (2010) ("We normally do not require plaintiffs to bet the farm by taking the violative action before testing the validity of the law."); *Morales* v. *Trans World Airlines, Inc.*, 504 U.S. 374, 381 (1992) ("When enforcement actions are imminent . . . there is no adequate remedy at law."); *Steffel* v. *Thompson*, 415 U.S. 452, 459 (1974). And the threat here is concrete: the Commission has issued cease-and-desist letters to numerous prediction-market operators and has pursued an administrative penalty against Kalshi. "[P]ast enforcement against the same conduct is good evidence that the threat of enforcement is not 'chimerical.'" *Susan B. Anthony*

*List* v. *Driehaus*, 573 U.S. 149, 164 (2014) (citation omitted); *see Kiser* v. *Reitz*, 765 F.3d 601, 608–10 (6th Cir. 2014) (Ohio board's warning letters).

160. The balance of equities favors relief. A State has no cognizable interest in enforcing a preempted law. *See Felder* v. *Casey*, 487 U.S. 131, 138 (1988); *Otto* v. *City of Boca Raton*, 981 F.3d 854, 870 (11th Cir. 2020) ("[N]either the government nor the public has any legitimate interest in enforcing an unconstitutional [law]."). It is true that preventing a State from effectuating statutes enacted by its representatives can itself constitute an injury, but that principle presupposes a valid statute. Where the state law is preempted as applied, the State is deprived of nothing to which it is entitled, and the interest it asserts carries correspondingly little weight.

161. Where a state law is likely preempted, the harm to the State from an injunction is correspondingly reduced. *See Minnesota*, 2026 WL 2150211, at *17 ("[W]hen a state law is likely preempted, the harm to the state by temporarily enjoining enforcement of that law is diminished"); *Raoul*, 2026 WL 2969682, at *18 ("Neither Illinois nor the public has much interest in enforcing laws that are likely preempted."). Defendants retain every enforcement tool should they ultimately prevail. Weighing on the other side are the reliance interests that have formed around a market the CFTC has permitted to operate. Exchanges have devoted substantial resources to building infrastructure that complies with the Act in reliance on the federal designation the CFTC grants, and participants have entered positions on the strength of it. Defendants' theory would unsettle those interests retroactively.

162. The public interest favors relief. "If the Act preempts [state] law, then the public interest is best served by *enforcing* the Act." *Flaherty*, 172 F.4th at 232 (emphasis added); *see Martin-Marietta Corp.* v. *Bendix Corp.*, 690 F.2d 558, 568 (6th Cir. 1982) ("It is in the public interest not to perpetuate the unconstitutional application of a statute."). The public also has an interest in the integrity of the uniform national framework Congress designed for derivatives markets, in the

informational value of prediction-market prices, which are theoretically more efficient the broader and more liquid the market, and in the supremacy of federal law. *See United States* v. *Alabama*, 691 F.3d 1269, 1301 (11th Cir. 2012) ("The United States suffers injury when its valid laws in a domain of federal authority are undermined by impermissible state regulations.").

163. A preliminary injunction would hold the parties' legal positions in place pending resolution of a question on which courts have divided, rather than permit criminal liability to attach to a federally designated exchange while that question remains open. In this Circuit, a petition for rehearing en banc of *Schuler* is pending, *see KalshiEX LLC* v. *Schuler*, No. 26-3196 (6th Cir. Oct. 9, 2026), ECF No. 92, and appeals raising the same questions are pending before the Sixth Circuit*, see Robinhood Derivatives* v. *Nessel*, No. 26-1542 (6th Cir.); *QCX, LLC* v. *Nessel*, No. 26-1552 (6th Cir.). Three petitions for certiorari presenting the core preemption question are also pending before the Supreme Court. A ruling at this stage "preserve[s] the status quo until the merits of [Novig's] claims can be fully adjudicated." *Minnesota*, 2026 WL 2150211, at *18.

164. Novig accordingly seeks a declaration that the Ohio laws identified above violate the Commerce Clause and are preempted as applied to event contracts traded on its federally designated contract market, and an injunction restraining their enforcement against Novig.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Novig respectfully requests that this Court enter judgment in Novig's favor and against Defendants as follows:

(i) Issue a preliminary and permanent injunction prohibiting Defendants and their officers, agents, servants, employees, and all persons in active concert or participation with them who receive actual notice of the injunction from enforcing against Novig, or any of its affiliates, officers, agents, servants, or employees, Chapters 2915, 3767, and 3775 of the Ohio Revised Code, including Ohio Rev. Code

§§ 2915.02, 3775.02, 3775.03(A), 3775.04, 3775.05, 3775.11, and 3775.99(B)(9); Ohio Rev. Code § 3772.04(B); Ohio Admin. Code 3775-1-08 and any other implementing Ohio Casino Control Commission regulations; and any other Ohio law or regulation to the extent it discriminates against interstate commerce in violation of the Commerce Clause or purports to regulate Novig's listing, trading, or settlement of event contracts on a DCM;

(ii) Award a declaratory judgment, pursuant to 28 U.S.C. § 2201 and 42 U.S.C. § 1983, that the foregoing provisions of Ohio law, and any rules adopted thereunder, violate the Commerce Clause of the United States Constitution and are preempted by federal law in violation of the Supremacy Clause, insofar as Defendants seek to apply them to prohibit Novig, or any of its affiliates, officers, agents, servants, or employees, from offering customers event contracts traded on a DCM; and

(iii) Grant such further relief as the Court deems just and proper.

Respectfully submitted,

Dated: November 16, 2026 By: /s/ Christopher R. Pettit

CHRISTOPHER R. PETTIT (0069926)
Dickie, McCamey & Chilcote, P.C.
10 West Broad Street, Suite 1950
Columbus, Ohio 43215
Tel: (614) 258-6000
Fax: (888) 811-7144
cpettit@dmclaw.com

PAUL J. SCHUMACHER (0014370)
Dickie, McCamey & Chilcote, P.C.
600 Superior Avenue East
Fifth Third Center, Suite 2330
Cleveland, Ohio 44114
Tel: (216) 685-1827
Fax: (888) 811-7144
pschumacher@dmclaw.com

and

**SULLIVAN & CROMWELL LLP**

Benjamin R. Walker (*pro hac vice forthcoming*)
Ann-Elizabeth Ostrager (*pro hac vice forthcoming*)
John J. Liolos (*pro hac vice forthcoming*)
Jason P. Barnes (*pro hac vice forthcoming*)
125 Broad Street
New York, NY 10004
Tel: (212) 558-4000
Fax: (212) 558-3588
walkerb@sullcrom.com
ostragerae@sullcrom.com
liolosj@sullcrom.com
barnesjas@sullcrom.com

Rishabh Bhandari (*pro hac vice forthcoming*)
1700 New York Avenue, N.W.
Washington, D.C. 20006
Tel: (202) 956-7500
Fax: (202) 293-6330
bhandarir@sullcrom.com

*Counsel for Plaintiff Ludlow Exchange, LLC d/b/a Novig*